# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 2, 2010

## STATE OF TENNESSEE v. SHANNON JONES

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 8503     Joseph H. Walker, III, Judge**

---

**No. W2009-01706-CCA-R3-CD  - Filed September 17, 2010**

---

The Defendant-Appellant, Shannon Jones, was convicted by a jury in Lauderdale County of facilitation of delivery of a Schedule II controlled substance less than 0.5 grams, a Class D felony, and delivery of a counterfeit controlled substance, a Class E felony. He was sentenced as a career offender to twelve years for facilitation and to six years for delivery of a counterfeit controlled substance. The trial court ordered these sentences to run concurrently to each other but consecutively to another unrelated case. On appeal, Jones challenges the sufficiency of the evidence. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Gary F. Antrican, District Public Defender; Periann Houghton, Assistant Public Defender, for the Defendant-Appellant, Shannon Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Julie K. Pillow, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Jones was indicted for delivery of a Schedule II controlled substance less than 0.5 grams and delivery of a counterfeit controlled substance. The following proof was adduced at trial.

**Trial.** Officer Gregg Land testified he was a drug investigator for the city of Ripley. He worked on two undercover drug purchases that involved Jones. The first purchase occurred on October 30, 2008. He served as the lead officer for this purchase. The second purchase took place on November 6, 2008.

Officer Land said there is a standard order of operations in preparing for undercover drug purchases. He described this procedure as follows:

> [M]ost of the time as a group we'll . . . have a predetermined location that we will meet our informants at. When we get there, usually each agent will take a different responsibility or duty as far as searching the informant to make sure they're not–don't have any contraband on them, searching the informant's vehicle and [making] sure there's not any contraband inside that vehicle. Other officers will set up the equipment in the vehicle and on the informant. And the case agent usually is the one that would actually hand the money to the informant and make sure that they're instructed where to go and what to do.

For the first drug purchase, Officer Land targeted a particular motel that had received complaints of drug activity. This purchase occurred during daylight hours. Officer Land said the operating procedure described above was followed. Officer Land worked with case agents Brian Kelley and Jeff Tutor. Amanda Cooper and David Armstrong, two undercover agents, also assisted with the purchase. Officer Land said forty dollars was given to Cooper to purchase drugs. She was equipped with a small camera that provided video recording and an audio feed. A small camera was also placed on the vehicle used by the undercover agents.

Officer Land testified that Armstrong and Cooper were instructed to go to the motel and purchase drugs. The undercover agents rode together to the motel. Officer Land parked the police vehicle a short distance away where he still could view the undercover agents. He saw Jones pull up to the motel in his vehicle and have a discussion with Cooper. Cooper stood outside of Jones's vehicle. Through the audio equipment, Officer Land listened as Jones asked Cooper if she needed anything. Cooper responded that she was looking for cocaine. Officer Land said an exchange took place. Officer Land acknowledged that he could not see the drug purchase. He said Armstrong remained in the undercover vehicle during the drug purchase. After the purchase was completed, Officer Land met the undercover agents at a predetermined meeting place. He retrieved the cocaine and the video recording. The cocaine was field tested and then submitted to the Tennessee Bureau of Investigation. Officer Land said he reviewed the video recording of the drug purchase. The video recording was played at trial. Officer Land identified Jones as the individual who

delivered the cocaine to Cooper. Officer Land then addressed his earlier testimony about his ability to see the drug purchase from his police vehicle. He stated:

> I know that there was money passed into the vehicle, to whom at that time I was watching I do not know, could not make out. All I could actually see was the vehicle and our informant at the driver's side window.

Officer Land said he could see that Cooper received something in exchange for the money.

Officer Land testified that he also assisted with the second drug purchase on November 6. Officer Kelley served as the lead officer. Officer Land said the same operating procedure was used for this second purchase. Cooper and Armstrong again worked as undercover agents. The second purchase took place near a cemetery. Officer Land was able to view the second transaction from a distance. He said the undercover agents were parked in their vehicle near the cemetery. Officer Land observed Jones approach the undercover agents by foot. Jones wore a yellow sweatshirt with a hood over his head. Officer Land was not close enough to see the purchase; however, after the purchase was completed, he drove past Jones. On the drive by, Officer Land was able to clearly identify Jones's face. Officer Land testified that he reviewed the videotape from the second drug purchase. He said the video accurately reflected the transaction that he visually monitored.

On cross-examination, Officer Land testified he was not the officer who searched Cooper before either drug purchase. He did search the vehicle that was used by the undercover agents. Officer Land said the money used during the drug purchases was not marked.

Officer Kelley testified that he was an investigator with the Lauderdale County Sheriff's Office. He assisted with the first drug purchase on October 30. Officer Kelley had several duties in preparing for this purchase. He equipped both Cooper and the undercover vehicle with a wire. He also searched the undercover agents for contraband. Officer Kelley was able to view the drug purchase with Officer Land from their vehicle parked near the motel. He saw Cooper make an exchange with someone in a parked vehicle. Officer Kelley reviewed the video after the drug purchase. He said the video showed Jones handing something to Cooper.

Officer Kelley served as the lead officer for the second drug purchase on November 6. This second purchase was arranged by Cooper through a phone call. Cooper had obtained Jones's phone number during the first purchase. Officer Kelley said Cooper and Armstrong were again searched for contraband. The undercover vehicle was also searched. Both Cooper and the undercover vehicle were wired with video and audio equipment. Officer

Kelley was able to listen to the drug purchase through a live audio feed. He also watched the drug purchase from a distance. He said Jones walked up to the undercover vehicle and made an exchange. After the exchange was made, Officer Kelley drove his vehicle by Jones for identification purposes. Officer Kelley then drove to the designated meeting area and retrieved the exchanged substances. He said Cooper gave him four white pills. The pills were submitted to the Tennessee Bureau of Investigation. Officer Kelley was shown the video from the second purchase. He said the video showed Jones making a hand-to-hand exchange with Cooper. Officer Kelley stated that the purchased pills had the same color, shape, size, and markings as ecstacy pills.

On cross-examination, Officer Kelley testified that the undercover agents and the undercover vehicle were searched before and after the drug purchases. The money provided for both purchases was not marked and it was not recovered. During the first drug purchase, Officer Kelley said Jones was not alone in his vehicle. Officer Kelley could not identify the other passenger. He was also unsure of where the drugs came from within the vehicle. Officer Kelley stated:

> On the tape I couldn't tell where Mr. Jones got what he handed the undercover [agent]. I couldn't tell if he got it from the console area or from the passenger. I . . . just couldn't tell. Nor could I tell who the passenger was. There is a shot of his face, but I did not know him.

Special Agent Dana Parmenter of the Tennessee Bureau of Investigation testified that she examined a rock-like substance that had an offense date of October 30, 2008. She concluded that the substance contained 0.2 grams of cocaine. Special Agent Parmenter also examined four white pills that were dated from November 6, 2008. She performed two tests on these pills and concluded that they did not contain any controlled substances. Special Agent Parmenter said the pills were similar in color, shape, and size to ecstacy.

Cooper testified that she volunteered to do undercover work for the Lauderdale County police department. She estimated that she assisted with over twenty-five cases. Cooper was paid one hundred dollars for each day she worked as an undercover agent.

Cooper testified that she did undercover work on October 30. She went to a motel where she had arranged to meet a woman. Cooper stated:

> I had [an] arrangement set up with a female up there, but she was not there. And I went to walk back to the car, and a gentleman in a car pulled up and approached me and asked me if I needed anything.

Cooper identified Jones as the man in the vehicle. She said she wanted forty dollars worth of crack cocaine. Cooper also requested Jones's phone number, which he provided. Cooper was given something in exchange for the forty dollars. She then left the motel and went to meet the case agents. During the drug purchase, Cooper said she wore a camera wire. She reviewed the videotape, which she said accurately reflected the drug purchase.

Cooper testified that she also assisted with the drug purchase on November 6. She called Jones by phone on the day before the purchase. She said Jones offered to sell her "some double stacks," which meant ecstacy. Cooper called the case agents and informed them of the offer. The next day, Cooper called Jones to set up the drug purchase. They agreed to meet near a cemetery. Cooper stated:

> We pulled up at the cemetery, and [Jones] was kind of across the street a little bit. And he walked across . . . the street up to my side of the car. And I opened up the car door. He handed me the double stacks, and I handed him the sixty dollars, and then he walked off.

Cooper said Jones wore a yellow jacket with a hood over his head. She testified that Jones was the individual who sold her the purported ecstacy on November 6. Cooper said her boyfriend, Armstrong, was present during both drug purchases. He was responsible for driving the undercover vehicle.

On cross-examination, Cooper said the case agents took several steps to prepare for the drug purchases. They searched the undercover vehicle and had the undercover agents empty their pockets. Cooper said she was not patted down by the case agents. During the first drug purchase, Cooper went to the motel to purchase drugs from someone named Lola. She knocked on the door of a motel room, but did not get a response. Cooper then noticed a vehicle in the parking lot filled with three or four passengers. She approached the vehicle and made the drug purchase. Cooper stated that "the guy in the passenger's seat gave the driver the dope, the crack cocaine, and then exchanged the crack cocaine for the money." Cooper testified that she only spoke to Jones who was the driver of the vehicle.

Armstrong testified that he worked on over twenty-five cases as an undercover agent. He served as an undercover agent because he wanted to eventually obtain a job in drug enforcement. Armstrong was paid one hundred dollars for each time he worked as an undercover agent. On October 30, Armstrong drove with Cooper to the motel to purchase drugs from Lola. He stayed in the vehicle while Cooper went to knock on the door of a motel room. When she was walking back towards her vehicle, someone yelled at her from another vehicle. Cooper went to the driver's side window of that vehicle. Armstrong

identified Jones as the driver. Armstrong could not identify the individual in the passenger's seat.

Armstrong also assisted with the drug purchase on November 6. He corroborated Cooper's testimony about the circumstances of the second purchase. Armstrong also identified Jones as the individual who delivered the pills to Cooper. On cross-examination, Armstrong said he was searched by the case agents before the first drug purchase. He stated that Cooper was not searched before or after that purchase.

Jones testified that on October 30, he was at a birthday party. He left the party with someone named Terry to purchase beer. Jones drove the vehicle and Terry rode as a passenger. Terry needed to use the restroom, so Jones drove him to his motel room. Jones stated that he and Terry were about to leave the motel when a woman flagged his vehicle down. Jones said the woman asked if they had seen Lola. She then asked if they had any drugs. Jones said Terry sold her drugs that were in his possession. Jones denied being involved with the transaction. He stated that he simply handed the drugs to the woman. Jones said no money was exchanged because Terry possessed an insignificant amount of cocaine. The woman was given Terry's phone number. Jones denied that he was involved with the second drug purchase on November 6. He claimed he never saw the woman again.

On cross-examination, Jones said he did not know Terry very well. He only knew Terry from around the neighborhood. Jones was not aware that Terry sold drugs. Jones said his only involvement with the drug purchase was handing the drugs to the woman. He again denied that any money was exchanged.

Following the proof at trial, Jones was convicted of the lesser-included offense of facilitation of delivery of a Schedule II controlled substance less than 0.5 grams. The jury also found him guilty of delivery of a counterfeit controlled substance. Jones filed a motion for new trial, which was denied. He then filed a timely notice of appeal.

## ANALYSIS

**Sufficiency of the Evidence**. Jones claims the evidence was insufficient to support his convictions for facilitation of delivery of a Schedule II controlled substance less than 0.5 grams and delivery of a counterfeit controlled substance. His brief contains no argument in support of his claims. The analysis in Jones's brief is limited to the following statement:

> It is respectfully submitted that the evidence fails to establish Mr. Jones'[s] guilt beyond a reasonable doubt. As is his right, Mr. Jones asks this court to review the record in light of this assertion.

-6-

The State asserts that a reasonable juror could have found Jones guilty of both offenses.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn.1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

The delivery of less than 0.5 grams of cocaine is a Class C felony under Tennessee Code Annotated section 39-17-417(b)(2)(A). Jones was convicted of facilitating the delivery of cocaine. Facilitation is defined under section 39-11-403(a), which states:

(a) A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Here, the elements of facilitation were met by Jones's own testimony. Jones acknowledged that he was aware of Terry's intent to deliver cocaine to Cooper. He said Terry offered to sell cocaine to Cooper while she was standing outside of their vehicle. Additionally, Jones effectively conceded that he provided substantial assistance in delivering the cocaine. He testified that he took the cocaine from Terry and handed it to Cooper.

Other evidence was presented that Jones furnished substantial assistance. Cooper testified that she was standing outside of the motel when Jones asked if she "needed anything." Jones was sitting in the driver's seat of the vehicle. Cooper went to the driver's side window and purchased cocaine. Cooper said she did not speak with anyone in the vehicle except for Jones. A video recording of the drug purchase was also introduced at trial. Both Officer Land and Officer Kelley testified that the video showed Jones handing an object to Cooper. Based on this evidence, a rational jury could have found that Jones facilitated the delivery of cocaine. Jones is not entitled to relief on this issue.

Jones was also convicted of delivery of a counterfeit controlled substance. This offense is codified under section 39-17-423, which states:

(a) It is an offense for a person to:

(1) Sell;

(2) Deliver; or

(3) Distribute a substance that is represented to be a controlled substance and which is substantially similar in color, shape, size, and markings or lack thereof, to a Schedule I, II, III or IV controlled substance as classified in §§ 39-17-406--39-17-412, in order that the substance may be sold as a controlled substance.

The record supports the conviction for delivery of a counterfeit controlled substance. Cooper testified that she called Jones and arranged to purchase "double stacks," or ecstacy. Cooper said she went to the arranged location and waited for Jones in a parked vehicle. She testified that Jones walked to the parked vehicle and handed her four pills in exchange for sixty dollars. Armstrong was also in the vehicle when the exchange took place. He identified Jones as the individual who delivered the pills to Cooper. Officer Land and Officer Kelley said they observed the exchange from a distance. They drove past Jones immediately after the exchange and both officers positively identified Jones. The officers said they also reviewed the video recording from the drug purchase. They testified that the video showed Jones making an exchange with Cooper. Officer Kelley said he met with

Cooper soon after the drug purchase. He retrieved four white pills from Cooper. Officer Kelley testified that the pills had the same color, shape, size, and markings as ecstacy. The pills were then submitted to the Tennessee Bureau of Investigation. Special Agent Parmenter determined that the pills did not contain any controlled substances. She said the pills were similar in color, shape, and size to ecstacy. In light of this evidence, a rational jury could have found that Jones delivered a counterfeit controlled substance. Jones is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE